UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |   |
|---|---|---|
| DAX GIBSON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Civil Action No. |
| v. | ) | 24-11550-FDS |
| | ) | |
| COMMONWEALTH OF MASSACHUSETTS, | ) | |
| | ) | |
| Respondent. | ) | |

MEMORANDUM AND ORDER ON
PETITION FOR A WRIT OF HABEAS CORPUS

**SAYLOR, C.J.**

This is an action is brought by a state prisoner seeking a writ of habeas corpus under 28 U.SC. § 2254. Petitioner Dax Gibson is serving a sentence of life without parole in Massachusetts custody. He was convicted of, among other things, first-degree felony murder.[1] The petition alleges that his detention is unlawful because he was denied his Sixth Amendment right to effective assistance of counsel during his trial.[2]

The Massachusetts Supreme Judicial Court considered and rejected that same claim.

---

[1] Petitioner was convicted of first-degree murder, home invasion, armed assault in a dwelling, armed assault with intent to rob, career criminal in possession of a firearm without a license, career criminal in possession of ammunition without a firearms license, and possession of a loaded firearm not at home or work. Petitioner was acquitted of three counts of kidnapping and one count of threatening to commit a crime. On direct appeal, the Massachusetts Supreme Judicial Court vacated petitioner's firearms convictions as inconsistent with *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022) and *Commonwealth v. Guardado*, 491 Mass. 666 (2023). *See Commonwealth v. Gibson*, 492 Mass. 559, 567, 579-80 (2023).

[2] The petition initially included a claim for insufficient evidence of breaking and entering in the day time. (ECF 1 at 5). That was not one of the charges brought against petitioner, and the Court has permitted him to correct the clerical error. (ECF 23).

Because the Court finds no reason to disturb those conclusions, and for the reasons set for below, the petition will be denied.

## I. Background

The following facts come from the Supreme Judicial Court's decision on the appeal of petitioner's motion for a new trial. *See Commonwealth v. Gibson*, 492 Mass. 559 (2023).

### A. Factual Background

On the morning of June 21, 2013, petitioner was at his apartment, which he shared with his girlfriend Ashley Fruguglietti. *See id.* at 561-62. Between 11 a.m. and noon, he received a phone call from Dinkue "D" Brown. *See id.* at 562. According to Brown's associate, Michele Kelley, Brown told petitioner he "'needed him. . . right away,' to do 'something' and that the defendant would 'be paid well.'" *Id*. After agreeing to help, petitioner provided Brown directions to his apartment. *See id*.

At around 12:10 p.m., Brown arrived in a car driven by Kelley. *Id.* Kelley's friend, Jenna Kearchner, and Kelley's toddler were also in the car. *See id.* at 561. Petitioner entered the car wearing all black clothing and a black hat. *See id.* at 562. He also had with him a duffel bag containing firearms and knives. *See id.*

During the car ride, Kelley heard Brown and petitioner discussing how the two would rob the victim, Luis Rodriguez, of drugs and cash. *See id.* After discussing the plan and scoping out Rodriguez's apartment, the group left and went to Brown's apartment. *See id.* Shortly thereafter, petitioner, Brown, and Kelley returned to Rodriguez's apartment building in Kelley's car. *See id.* Kelley testified that petitioner left her and Brown in the car after wrapping a black T-shirt around his head and face. *See id.* 562-63.

Rodriguez's girlfriend, Cendy Mejia-Rincon, testified that at "[a]bout twelve" she heard a knock at the apartment door. *See id.* 563. Mejia-Rincon and Rodriguez were in their bedroom at

the time. *See id*. After leaving his gun on the bed, Rodriguez went to the door and asked who was there. *See id.* Mejia-Rincon then heard "it's D." *See id.* Rodriguez opened the door, and a fight immediately broke out. *See id.*

During the fight, Mejia-Rincon hid in the bedroom. *See id.* After hearing the fight dissipate, she peeked out the bedroom door and saw a person "wearing all black" with "a black hat that covered the whole head" pointing an "old fashioned gun" at Rodriguez. *Id.* Mejia-Rincon again closed the bedroom door. *See id.* She then heard running followed by two or three gunshots. *See id.* When she again opened the door, Rodriguez was missing. *See id.*

Other witnesses testified about the events at trial. *See id.* 563-64. Amanda Compton, Rodriguez's first-floor neighbor, heard "a bunch of noise," at "exactly noon," but did not recall gunshots. *Id.* Kelley, still sitting in her car outside, heard approximately three gunshots a few minutes after petitioner left her vehicle, and about one minute later saw Rodriguez leave the apartment building shirtless and bleeding from the chest. *See id.* at 563. Rodriguez's neighbor, Gary Laaksonen, testified that he got home from work "around 12:45 p.m." and saw "his neighbor, [Rodriguez] . . . come out of his apartment building" looking scared. *Id.* at 564.

After the shooting, petitioner got back into Kelley's car and stated that his "life [was] over" because his DNA "would be in [Rodriguez's] apartment." *Id.* at 563. Petitioner then removed his T-shirt, leading Kelley to notice his hand was cut and that he was bleeding on her back seats. *See Gibson*, 492 Mass. at 563. Kelley testified that petitioner stated how "[Rodriguez] fought back, and that he did not want to kill [Rodriguez], but that [Rodriguez] was going to die." *Id.* at 563-64. After this, Brown ordered Kelley to drive to a nearby convenience store so the group could "get rid of the guns," and clean the blood out of the back seats. *See id.* at 564. While at the convenience store, Brown and petitioner swore Kelley to secrecy

concerning the day's events.  *See id.*

After Kelley cleaned the car, the group went to the apartment of a friend of petitioner, Tiffany Phillinger.  *See id.*  Phillinger testified that the group arrived "between 1 p.m. and 1:30 p.m.," appeared nervous, and needed to clean up in her shower.  *See id.*  Phillinger also testified that, after listening to a police scanner to see if law enforcement was searching for Kelley's car, petitioner left to pick up his girlfriend and her friend.  *See id.*

Petitioner arrived at Frugugliettti's mother's house around 2:30 p.m.  *See id.* at 565.  Once there, petitioner told Frugugliettti "that he fucked up, and he was sorry."  *See id.*  The discussion concluded with petitioner asking both his girlfriend and her friend to tell the police that he was with them "from twelve to five" that day.  *See id.*

**B.    Procedural Background**

In August 2013, a grand jury indicted petitioner for multiple crimes, including first-degree murder.  *See id.* at 567.  The trial began in January 2016.  *See id.*  At trial, Kelley, Phillinger, Mejia-Rincon, Kearchner, Frugugliettti, and several other witnesses testified. (ECF 12 Ex. 1).  On February 9, 2016, a jury convicted petitioner on multiple charges, including first-degree murder.  *See Gibson*, 492 Mass. at 567.  Petitioner was sentenced to life without parole.

He timely appealed to the SJC.  *See id.*  The SJC stayed the appeal so petitioner could file a motion for a new trial in the Superior Court, which he did.  *See id.*  Petitioner alleged, among other things, that his trial counsel was ineffective.  *See id.*  The court denied the motion.  *See id.*  Petitioner appealed that decision to the SJC, which consolidated his appeals and affirmed the trial court's decision.  *See id.*

On June 13, 2024, he filed a petition for a writ of habeas corpus in this court.

**II.    Standard of Review**

Under 28 U.S.C. § 2254(d), a federal court may not issue a habeas petition "with respect

4

to any claim that was adjudicated on the merits in State court proceedings" unless the state-court decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under § 2254(d)(1), a state-court decision is "contrary to" clearly established federal law if it (1) "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or (2) resolves a case differently from the Supreme Court on a set of "materially indistinguishable" facts. *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). In either scenario, the state-court decision must be "substantially different," "diametrically different," "opposite in character or nature," or "mutually opposed" to Supreme Court precedent. *Williams*, 529 U.S. at 405.

A state-court decision involves an "unreasonable application" of federal law if the state court identified the correct governing legal principle from the Supreme Court's decisions but applied it in an objectively unreasonable manner. *See Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (citing *Williams*, 529 U.S. at 409). The Supreme Court has cautioned that "[a]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410. The state court's application of federal law must be "more than incorrect or erroneous." *Lockyer*, 538 U.S. at 75 (citing *Williams*, 529 U.S. at 410, 412); *see also Teti v. Bender*, 507 F.3d 50, 57 (1st Cir. 2007) ("A decision can still be reasonable even if the reviewing court thinks it is wrong; 'unreasonable' here means something more than incorrect or erroneous."). Furthermore,

> if it is a close question whether the state decision is in error, then the state decision cannot be an unreasonable application . . . . [S]ome increment of

5

incorrectness beyond error is required. The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court.

*McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir. 2002) (citations and quotation marks omitted). Habeas relief is intended to protect petitioners from "extreme malfunctions in the state criminal justice systems." *Jackson v. Virginia*, 443 U.S. 307, 322 n.5 (1979). It is not a "substitute for ordinary error correction through appeal." *Harrington v. Ritcher*, 562 U.S. 86, 102-03 (2011).

### III. Analysis

Petitioner challenges his detention on the ground that he did not receive effective assistance of counsel during his trial. He alleges that by failing to introduce three sets of call logs, his trial counsel's performance fell short of the constitutional standard for effective assistance established in *Strickland v. Washington*. *See* 466 U.S. 668 (1984); (ECF 1 at 5).[3] He contends that those records (1) would have established an alibi, (2) should have been used to impeach Kelley, and (3) supported a claim that Brown was the actual killer. (ECF 15).

Petitioner raised the same claim before the SJC, which denied it. *See Gibson*, 492 Mass. at 568. The question before this Court is whether the SJC unreasonably applied "clearly established Federal law" in rendering that decision. 28 U.S.C. § 2254(d)(1).

#### A. Standard for Collateral Review Under *Strickland*

"Since an ineffective assistance of counsel claim is a mixed question of law and fact, [on habeas review] it is evaluated under the 'unreasonable application' clause of § 2254(d)." *Yeboah-Sefah v. Ficco*, 556 F.3d 53, 62 (1st Cir. 2009). To succeed on such a claim, it must be

---

[3] Petitioner requests a new trial, but it is unclear whether the Court can order the Commonwealth to offer him that relief, assuming he prevails on his claim. In any event, the Court need not decide the appropriate scope of relief, because it will deny the petition.

so obvious that petitioner's trial counsel failed to meet the *Strickland* standard that "there could be no fair-minded disagreement on the question." *See Ayala*, 85 F.4th at 53 (internal quotations omitted). Furthermore, a petitioner "must show both deficient performance by counsel and resulting prejudice." *Thompson v. United States*, 64 F.4th 412, 421 (1st Cir. 2023); *see Strickland*, 466 U.S. at 687.

In an ordinary *Strickland* claim, a defendant can establish deficient performance if he can show "his 'counsel's representation fell below an objective standard of reasonableness.'" *Thompson*, 64 F.4th at 421 (quoting *Tevlin*, 621 F.3d at 66). Courts "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 689). "An attorney's performance is deficient. . . only where, given the facts known at the time, counsel's choice was so patently unreasonable that no competent attorney would have made it." *Thompson*, 64 F.4th at 421 (quoting *Vargas-De Jesús v. United States*, 813 F.3d 414, 417-18 (1st Cir. 2016)).

In addition, those objectively unreasonable errors must have prejudiced the defendant—that is, the defendant must show "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 694). "[S]how[ing] that the errors had some conceivable effect on the outcome of the proceeding" is insufficient; instead, petitioner must show that the errors were "so serious as to [have] deprive[d] [him] of a fair trial. . . ." *Id.* (quoting *Strickland*, 466 U.S. at 687). Petitioner must therefore show a substantial "likelihood of a different result." *Id.* at 112-13.

But when a federal court reviews a state-court decision involving a *Strickland* claim, the standards are "doubly deferential." *See Ayala*, 85 F.4th at 53 (citing *Burt v. Titlow*, 571 U.S. 12, 15 (2013)). There can be "no fair-minded disagreement" both that trial counsel's performance was deficient, and that the petitioner was prejudiced by those deficiencies. *See id.*

B.   **The SJC's Application of *Strickland***

Petitioner's claim of ineffective assistance of counsel is based on counsel's choice to not introduce certain phone records. *See Gibson*, 492 Mass. 568. Petitioner alleges that the records support (1) an alibi for petitioner at the time of the shooting, (2) a means of impeaching Kelley, and (3) a theory that Brown was the actual killer. *See id.* at 569-72.

1.   **Records Purporting to Demonstrate an Alibi**

Petitioner contends counsel possessed a telephone record showing a call from his apartment landline to Brown at 12:16 p.m. on the day of the shooting. *See Gibson*, 492 Mass. at 569. He further contends that the testimony of Mejia-Rincon and Rodriguez's neighbor placing the shooting at "around noon" makes it impossible for petitioner to be the killer if he were using his apartment phone at 12:16 p.m. *See id.*

The SJC disagreed. *See id.* It found that "the witnesses provided varying testimony about when exactly the shooting occurred." *Id.* Because of this, there were "multiple different estimates of the precise time of the shooting" between noon and 2:00 p.m. *Id.* The SJC concluded that "even if trial counsel had introduced the 12:16 p.m. call at trial and were able to prove the [petitioner] was the individual who made that call, it likely would have had little effect on the jury's verdict." *Id.* The court also noted that trial counsel proffered an alibi for petitioner at 12:10 p.m. through the testimony of his girlfriend, Ashley Fruguglietti. *See id.* at 570. As a result, the SJC found that the "failure to introduce [the 12:16 p.m. call] cannot be said to have

8

resulted in a substantial likelihood of a miscarriage of justice." *Id.*

That finding was reasonable. The deferential standard of *Strickland* permits courts to find performance of trial counsel deficient "only where, given the facts known at the time, counsel's choice was so patently unreasonable that no competent attorney would have made it." *Thompson*, 64 F.4th at 421. The SJC reasonably determined that trial counsel had already offered evidence of an alibi for petitioner up until 12:10 p.m., which conflicted with the testimony of Mejia-Rincon and Rodriguez's neighbor. *See id.* Even if the call could establish an alibi for petitioner, that alibi would amount only to six minutes more than the alibi evidence elicited through Fruguglietti's testimony. *See id.* In that context, introducing evidence of the call would not substantially change the contours of petitioner's defense. Therefore, omitting evidence of the call was reasonable, and in any event did not substantially change the likelihood of acquittal.

Accordingly, the SJC reasonably concluded that the failure to introduce the calls did not undermine petitioner's right to effective assistance of counsel.

### 2. Records Seeking to Impeach Kelley

Petitioner also contends that evidence of Kelley's telephone records indicated "she was sending and receiving text messages and telephone calls between 11 a.m. and 1 p.m. on the day of the shooting." *See id.* He alleges that those records would have directly countered Kelley's testimony that she could not access her phone. *See id.*

The SJC, again, disagreed. *See id.* It held that the evidence, even if it had been introduced, would not have likely altered the outcome of the case for two reasons. *See id.* First, petitioner's counsel and an investigating officer believed that the records were unreliable, because it was "difficult to distinguish who was using which cell phone" and because there was

9

"a lot of handing of cell phones back and forth." *Id.* Second, trial counsel "diligently and thoroughly impeached Kelley by questioning her" about a host of topics, including her drug use, different stories, relationship with Brown, and benefits for testifying. *See id.* at 571. The SJC concluded that introducing Kelley's records would have at most "been cumulative of the ample information trail counsel already had available and used effectively." *Id.*

That conclusion was reasonable. A reasonable attorney need not introduce every possible piece of impeachment evidence. *Thompson*, 64 F.4th at 421 (quoting *Tevlin*, 621 F.3d at 66). Furthermore, even if counsel's decision not to introduce the records represented a deficient performance in order to violate *Strickland*, it must have created "[a] reasonable probability . . . sufficient to undermine confidence in the outcome." *Harrington*, 562 U.S. at 104. And "[c]umulative evidence generally 'offer[s] an insignificant benefit if any at all' for purposes of a *Strickland* claim." *Ayala*, 85 F.4th at 60 (quoting *Wong v. Belmontes*, 558 U.S. 15, 23 (2009)).

Again, the SJC found that counsel diligently cross-examined Kelley. *See Gibson*, 492 Mass. at 571. Introducing the records that were admittedly "difficult to distinguish" likely "would not have affected the jury's verdict in this case." *Id.* Petitioner therefore has not shown that it is "reasonably likely the result would have been different" had Kelley's phone records been introduced, and therefore the SJC reasonably concluded that there was no prejudice from the omission. *Strickland*, 466 U.S. at 696; *Harrington*, 562 U.S. at 111-12.

### 3. Records Supporting Brown as the Killer

Finally, petitioner contends that introduction of Brown's telephone records would have implicated him as the killer rather than petitioner. *See Gibson*, 492 Mass. at 571. Petitioner alleges that those records show that Brown was constantly using his phone on the day of the offense, except for a "twenty-one minute period of inactivity between 12:22 p.m. and 12:43 p.m.

10

on the day of the shooting." *Id.*

Again, the SJC disagreed. *See Gibson*, 492 Mass. at 572. It concluded that while Brown's phone records did in fact show a lack of activity during this critical period, they also generally "showed multiple telephone calls between [petitioner] and Brown on the day of the shooting," which "corroborated Kelley's and Fruguglietti's testimony" and "equally tied [petitioner] to Brown." *Id.* at 571. The SJC therefore found that the "introduction of the cell phone records had the simultaneous potential to incriminate and exculpate [petitioner]," which was not, on balance, so exculpatory that it was likely to change the trial's outcome. *Id.*

That conclusion, too, was reasonable. Even if counsel should have introduced Brown's phone records, it was reasonable to conclude that the records would not tend to change the weight of the evidence. *See Harrington*, 562 U.S. at 111-12. The records suggest that Brown was occupied during that time, but they also support the Commonwealth's theory of a joint venture. The SJC therefore reasonably concluded that petitioner failed to establish prejudice from the omission. *See id.*; *Ayala*, 85 F.4th at 53.

## IV.    Conclusion

In summary, petitioner has failed to demonstrate (1) either deficient performance by counsel or resulting prejudice sufficient to establish ineffective assistance of counsel within the meaning of the Sixth Amendment, or (2) that the conclusion of the Supreme Judicial Court denying his claim of ineffective assistance of counsel was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," as required by 28 U.S.C. § 2254(d). According, and for the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

**So Ordered.**

Dated:  April 11, 2025

/s/  F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court